HOUSE *v.* ROAD IMPROVEMENT DISTRICT No. 2.

Opinion delivered April 16, 1923.

1. HIGHWAYS—ROAD IMPROVEMENT ACT—APPROVAL OF PLANS—APPEAL.—Although act 245 of 1919 (Road Acts 1919, p. 1025) made no provision for an appeal from the order. of the county court approving the plans for the road improvement, the right of appeal nevertheless existed, and could have been exercised by any landowner, and the plans would not have become final until such appeal had been disposed of.

2. HIGHWAYS—ROAD IMPROVEMENT ACT—APPEAL FROM ASSESSMENT.—Under 1 Road Acts 1919, p. 1025, a landowner may, if he desires, appear before the commissioners and complain of his assessment and then apply to the chancery court, or he may, if he prefers, wait until the commissioners have passsed upon the assessments and then apply to the chancery court for relief, and

in either case he is entitled to an original hearing *de novo;* but if he fails to ask relief either from the commissioners or from the chancery court, the assessment becomes final and binding.

3.  HIGHWAYS—ROAD IMPROVEMENT ACT—SUFFICIENCY OF NOTICE OF ASSESSMENT.—1 Road Acts 1919, p. 1025, providing for publication of notice of filing an assessment of benefits for two weeks in some newspaper published in the county, and permitting the landowner, within ten days after the last insertion of said notice, to appear before the commissioners to question the assessment of his land, and providing that within ten days after the hearing before the commissioners he may apply to the chancery court for relief, *held* to furnish sufficient notice to constitute due process.

4.  PLEADING—EFFECT OF DEMURRER.—As a demurrer admits only those facts which are well pleaded, a demurrer to a complaint alleging that no notice of the intention to introduce a local or special bill was published as required by art. 5, § 26, of the Constitution, does not admit that no such notice was given, but submitted to the court that, as a matter of law, the question was one into which the courts would not inquire.

5.  HIGHWAYS—LEGISLATIVE ASSESSMENT OF BENEFITS—DUE PROCESS.—The Legislature, if it sees proper, may ascertain the benefits against lands and assess them, without violating the due process clause of the Constitution of the United States.

6.  HIGHWAYS—ROAD IMPROVEMENT DISTRICT—NOTICE OF ASSESSMENTS.—Where the Legislature created a road improvement district and named it and designated its boundaries, and the published notice of filing the assessments referred to the district by its official name and gave the time and place when and where complaints as to the assessment of benefits in that district would be heard, this was sufficient notice.

7.  HIGHWAYS—ASSESSMENT OF BENEFITS.—An assessment of benefits in a road improvement district is not open to attack upon the ground that they were made under a mistake of fact or that there was a discrimination in favor of or against certain property owners, unless the attack is made within ten days after the completion of the hearing on the assessments by the commissioners.

8.  HIGHWAYS—ROAD IMPROVEMENT DISTRICT—FILING CERTIFICATE OF ENTIRE LEVY.—There is no jurisdictional requirement that the commissioners of a road improvement district should file with the county clerk a certificate showing the entire levy against the entire district with the entire cost of the improvement spread over the series of years during which it had been determined that the taxes should be collected.

9. Highways—road improvement district—levy of assessments. —Where the commissioners of a road improvement district annually determined the percentage of benefits to be levied in the district, but, after making the levy, passed resolutions requesting the county quorum court also to levy taxes, such action by the quorum court added nothing to the validity of the levy, but did not invalidate it.

10. Highways—road improvement district—change of plans.— Where the original plans of a road called for a width of 9 feet, but the State and Federal highway departments directed that it be built 16 feet wide at an excess cost of $118,000, such excess being paid for by Federal aid not otherwise available, the commissioners were empowered to make the change.

Appeal from Conway Chancery Court; *W. E. Atkinson,* Chancellor; affirmed.

*Hill & Fitzhugh,* for appellant.

The finding that the levy of the tax as required by the act had been duly made is wholly without evidence to sustain it. The notice was insufficient in time, giving the landowners less than 20 days to appear and be heard in opposition to their assessments. 12 Corpus Juris, 1061; 64 Ark. 555; 78 Ark. 580. A totally different situation exists here from that in 74 Ark. 174, 204 U. S. 241, 51 L. ed. 461. See also 176 U. S. 398, 219 U. S. 47, L. ed. 82; 131 Ark. 28; *Caton* v. *Western Clay Dist.,* 87 Ark. 8. Notice insufficient on its face is insufficient. 12 Corpus Juris 1262; 65 Cal. 313; 15 N. Dak. 365; 109 N. W. 363; 125 Am. St. Rep. 599; 193 U. S. 79, L. ed. 623; 223 U. S. 261, L. ed. 429. Assessment made under mistake of fact. 121 Ark. 105; 141 Ark. 164; 141 Ark. 596; Pomeroy's Equity Jurisprudence, §§ 852, 854. Discrimination against appellant in assessments so gross as amounts to a fraud. No valid levy was made, and the assessment is void. 147 Ark. 518. Statute there construed should be compared to the one herein. The assessment is void because of material changes in plan of road from 9 to 16-foot width. 130 Ark. 410.

*Owens & Ehrman,* for appellees.

Notice was sufficient in time. 219 U. S. 47; 130 U. S. 559, 32 L. ed. 1045; 172 U. S. 314; 140 U. S. 316;

149 U. S. 30. Case cited by appellant. Nothing in 204 U. S. 241, 51 L. ed. 461, indicating that a notice for a shorter time than 4 weeks would be insufficient to constitute "due process." 160 U. S. 112, 41 L. ed. 369; 191 U. S. 310, 48 L. ed. 195. Many of the special acts creating road improvement districts in the State provide for a notice by two weeks' publication, and several of them have been held constitutional, and it cannot be said that the notice and opportunity for a hearing provided in this act is a departure from that usually afforded persons in this State. There is a class of cases that are somewhat analogous to this character of controversy. 214 U. S. 69, 53 L. ed. 914, followed in 239 U. S. 373; 25 Idaho 46. Decision in 176 U. S. 398, 53 L. ed. 520, has no bearing on this case. Nonresidence cannot relieve the owner from the duties and obligations which the law imposes upon him in regard to his property in the State. 130 U. S. 559, 32 L. ed. 1045; 69 U. S., 2 Wall. 328; 90 U. S., 23 Wall. 108; 95 U. S. 722; 111 U. S. 701; 95 U. S. 37; 96 U. S. 105; 98 U. S. 403; 204 U. S. 241. Form of the notice sufficient. Cases cited by appellant reviewed and distinguished. Boundaries of this district had been fixed by special act of the Legislature. Assessment is not subject to collateral attack. No contention is made that the property has not been and will not be benefited by the improvement made and that its inclusion in the district was arbitrary, and the action of the Legislature is conclusive. 63 Law ed. U. S. 1081; 64 L. ed. U. S. 215; U. S. 63, L. ed. 859; U. S. 60, Law ed. 266; 139 Ark. 168; 139 Ark. 277; 144 Ark. 632; 151 Ark. 484. Nothing to the contrary in 141 Ark. 596. Direct attacks were made on the assessments in cases of 121 Ark. 105 and 141 Ark. 164, cited by appellant, and in both the assessments were upheld. Zone system of assessments may be adopted upon proper consideration. 124 Ark. 292; 121 Ark. 105; 241 S. W. 883. Benefits may be determined according to the assessed valuation of the lands for general taxes. 68 Ark. 376; 69 Ark. 68; 86 Ark. 1. Can't complain

after time of reduction in assessment of railroad property necessitating an increase in assessment of benefits to other landowners. 149 Ark. 469. Levy was valid. 147 Ark. 518. Changes in plans not material and did not render assessment void. Wide discretion is given the commissioners in making changes. 138 Ark. 410; 135 Ark. 104; 150 Ark. 379; 241 S. W. 866.

Smith, J. Appellant, who was the plaintiff below, brought this suit to enjoin the collection of an assessment of betterments for road taxes against her lands by Road Improvement District No. 2 of Conway County. She alleged that she owned 3,217 acres lying in the district; that the *ad valorem* assessment against the land for general revenue purposes was $43,030, and that the benefits assessed for the improvement of the road were $19,035, which are payable in twenty annual installments of $1,516.15, amounting in all, with the interest thereon, to $30,323.

The road improvement district was created by act 245 passed at the regular session of the 1919 General Assembly, and, pursuant to the authority therein conferred, the commissioners named by the county court assessed the betterments which the plaintiff, by this suit, seeks to enjoin.

The organization of the district and the assessment of betterments by it are attacked on the following grounds: (1) That the notice of the assessment of betterments, which, by the terms of the act, became liens on the land situated within the district, was insufficient in time to constitute due process of law; (2) that the notice to the property owners was insufficient on its face; (3) that the assessments were made under a mistake of fact, and are void on that account; (4) that the assessments are void because of discrimination against appellant in assessing the betterments against her land; (5) that there was no valid levy of the assessments the collection of which is sought to be enjoined; (6) that the assessments are void because the commissioners made a

material change in the plans upon which the assessments were based without revising the assessments.

Relief against plaintiff's assessments was denied upon any of the grounds of attack, and her complaint was dismissed as being without equity, and she has appealed.

We will discuss these questions in the order stated.

Act 245 of the Acts of 1919 (Special Road Acts, vol. 1, p. 1025) contained the emergency clause and became a law on March 11, 1919. It is substantially identical with a number of other special road laws passed at that session, and its provisions here under review are practically identical with those of a number of these other acts relating to the same subject.

The act created Road Improvement Districts 2, 3, 4 and 5, and defined the boundaries of each, and section 9 thereof directed the county court to appoint three commissioners for each of these districts. These commissioners were duly appointed, and qualified and entered upon and proceeded to discharge the duties imposed upon them. By section 11 it was made the duty of the commissioners to improve and construct the roads therein described by grading, draining and surfacing them, or parts of them, in such manner and with such materials as the plans of the district may designate, and by constructing bridges and culverts as needed, according to plans that may be approved by the county court.

Section 13 provided for preliminary plans to be made by the State Highway Department, and authorized the commissioners to use these plans or to return them to the State Highway Department for amendment, and the Highway Department was directed to make plans and estimates upon the request of the commissioners, and to "amend any plans and estimates on more than one type or surface of the road, or its parts, containing alternative plans for bridges or culverts, together with any recommendation they may see fit to make."

Section 14 deals also with the plans to be adopted, but provides that the plans finally adopted shall be approved by the State Highway Department.

By section 16 it was provided that, after the plans had been approved, they should be filed with the clerk of the county court. The plans for District No. 2 were filed with the clerk of the county court on May 17, 1919, and were duly approved on June 14. The order of approval recited that no one had appeared in opposition to them.

Section 17 of the act contemplated that the plans of the improvement, as approved by the county court, might prove beneficial to lands not embraced in the original district as defined by the act, and provision was made for the extension of the boundaries of the district to include such lands. This section of the act required two weeks' published notice of that proceeding, and provided that the hearing thereon should not be less than ten days after the date of the last publication of the notice, and, after the hearing by the county court there provided for, any landowner whose lands were thus included was given ten days in which to appeal from the order of the court. None of the plaintiff's lands were brought into the district in this manner, but these, as well as other provisions of the act, must be taken into account in determining the shortest time in which a lien could be fixed upon the lands.

After the commissioners, with the approval of the State Highway Department, had finally worked out the proposed plans, and had filed them with the clerk of the county court, that officer was required, by section 18, to give notice of that fact by publication once a week for two weeks in some newspaper published in the county, designating the date that the county court would be in session for the submission of the plans to it, the last insertion of said notice to be not less than five days before the date of the consideration of said plans. A form of this notice is set out in section 18.

Section 19 provides that, on the date named in the notice, the county court should consider said plans, and should hear any landowner interested therein, and that the hearing should be continued from time to time until completed, and that when said plans had been approved, or had been modified and approved, they should be the plans of the district.

The act contains no express provision for an appeal from the order and judgment of the county court approving these plans, but the right of appeal existed and could have been exercised by any landowner, and the plans would, of course, not have become final until such appeal had been disposed of. *Carter* v. *Randolph County,* 146 Ark. 221; *Huddleston* v. *Coffman,* 90 Ark. 219.

Section 20 provides that, immediately after the approval of the plans, the commissioners shall proceed to make an assessment of benefits against the real property within the district, and shall inscribe the same in a book in which all the land shall be shown, and shall show opposite each tract the benefits assessed against it. As a part of the assessments, the commissioners were required to find and state any damages to any land which would result from the construction of the proposed improvement. The original of this book remained with the commissioners, but they were required to make a copy thereof and file it with the county clerk, and this they did. Immediately upon filing this copy with that officer, it became his duty to give notice by publication, once a week for two weeks, in some newspaper published in the county, stating the fact that the assessment of benefits and damages to the lands in said district had been filed in his office, and to designate the date fixed by the commissioners on which the commissioners would hear any complaint against said assessments, the date of said hearing to be not less than ten days after the last insertion of said notice.

The assessment of benefits and damages was filed by the commissioners on June 17, 1919, and the notice thereof was published in a weekly newspaper published in that county in the issues of June 18 and June 25, and advised all persons to file their objections on or before July 7, 1919, the date named for the hearing of complaints by the commissioners. Section 20 prescribed the form of this notice, and the notice given conformed thereto, and it also required the commissioners to attend at the time and place specified in the notice for the purpose of hearing any complaints against any of said assessments of benefits or damages, and that any person failing to appear or complain within the time limited should be deemed to have waived any objection to his assessment of benefits or damages. The commissioners were directed at this hearing to so adjust the assessments as that, when adjusted, they should be equitable and just.

Section 21 provided that any aggrieved property owner might, within ten days after the hearing by the commissioners, file complaint in the chancery court against his assessments, and that court was directed to hear such complaint and equity in the matter, and, to that end, was authorized, if it was found proper so to do, to set aside the entire assessment and to order a new assessment in the manner and after the notice and hearing provided in the original assessment. It thus becomes obvious that the hearing provided for before the chancery court is itself a *de novo* hearing.

After the approval of the assessments by the commissioners, any property owner had ten days thereafter in which to apply to the chancery court for relief, and the right to so apply was not limited to those property owners only who had appeared and protested before the commissioners, for, after providing that persons who had complained in writing of their assessments might appeal, § 21 also provided that "any other person whomsoever who might have any objection to any assessment

of benefits or damages, or to any other proceeding under this act or action of the commissioners,'' might file complaint in the chancery court within ten days after the completion of the hearing by the commissioners.

This language is too broad for its meaning to be mistaken. The landowner was given an opportunity, if he desired it, to appear and complain before the commissioners about his assessments, or, if he preferred, he might wait until the commissioners had passed upon the assessments and then appeal to the chancery court, and in either case he was entitled to an original *de novo* hearing. It was not necessary that he formally make himself a party to the proceedings. He was made a party by the act itself, and, unless he appeared before the commissioners and was heard by them, he waived the right to that hearing; and if, at the conclusion of the hearing by the commissioners, a hearing by the chancery court was not invoked, the assessment became final and binding. *Coffman* v. *Road Improvement Dist. No. 6 Lawrence County,* 134 Ark. 411.

The case of *Foster* v. *Bayou Meto Drainage District,* 132 Ark. 141, involved the right of landowners to protest against their assessments for drainage purposes. The act there construed provided that any aggrieved property owner might appear before the county court within ten days after the publication of the notice of the assessment of betterments, and should have the right of appeal from the order of the county court upon his complaint within twenty days thereafter. It was there contended that only those persons could appeal from the order and judgment of the county court who had made themselves parties to the proceedings in that court. But we held that it was the purpose of the lawmakers to treat each property owner as a party to the record, so far as it affected the assessment of his property, and to give him the right of appeal at any time within twenty days after the final order of the court fixing the assessments, whether he had in fact ap-

peared before the county court or not. Here the property owners must also be regarded as being before the commissioners, with the right to apply to the chancery court, whether they filed formal protest against their assessments or not, and this additional ten days must therefore be taken as a part of the time allowed by the act within which an aggrieved property owner might question his assessment in the chancery court. So that, if it be assumed that the commissioners would proceed with the greatest expedition possible in fixing liens on the lands in the district, and should discharge that duty perfunctorily or in bad faith, the property owner would have at least eighteen days in which to question his assessment before the commissioners, after the first publication of the notice that betterments had been assessed, which is itself, in our opinion, due process of law, and he also has, in addition, ten days to proceed under section 21, giving him 28 days, under any circumstances, to appear and oppose his assessments.

Is that notice sufficient to constitute due process of law? We answer this question in the affirmative; and we do so upon the authority of the case of *Ballard* v. *Hunter*, 204 U. S. 241, and other decisions of the Supreme Court of the United States cited in the briefs of respective counsel, both prior and subsequent to that case. This case of *Ballard* v. *Hunter* originated in this State (74 Ark. 174), and went to the Supreme Court of the United States upon writ of error from this court. That case arose out of a suit to collect delinquent taxes of the St. Francis Levee District. The act creating that district was the first of its kind in this State, and has served as a pattern for numerous other districts creating levee, drainage, road and other improvement districts. That act was upheld both by this court and by the Supreme Court of the United States, and, in the opinion of that court, it was said: "It should be kept in mind that the laws of a State come under the prohibition of the 14th Amendment only when they infringe funda-

mental rights. A law must be framed and judged of in consideration of the practical affairs of man. The law cannot give personal notice of its provisions or proceedings to every one. It charges every one with knowledge of its provisions; of its proceedings it must, at times, adopt some form of indirect notice, and indirect notice is usually efficient notice when the proceedings affect **real** estate. Of what concerns or may concern their real estate men usually keep informed, and on that probability the law may frame its proceedings, indeed, must frame them, and assume the care of property to be universal, if it would give efficiency to many of its exercises. This was pointed out in *Huling* v. *Kaw Valley R. & Improv. Co.,* 130 U. S. 559, 32 L. ed. 1045, 9 Sup. Ct. Rep. 603, where it was declared to be the 'duty of the owner of real estate, who is a nonresident, to take measures that in some way he shall be represented when his property is called into requisition; and, if he fails to get notice by the ordinary publications which have been usually required in such cases, it is his misfortune, and he must abide the consequences.' It makes no difference therefore that plaintiffs in error did not have personal notice of the suit to collect the taxes on their lands or that taxes had been levied, or knowledge of the law under which the taxes had been levied."

Counsel for appellant attempts to distinguish that case from this, and one of the distinctions pointed out is that the Ballard case was a proceeding to collect an assessment of betterments in an existing district, whereas this case involves the validity of a proceeding whereby the lien was imposed upon the lands lying in the district, and it is urged therefore that the greater publicity of that case constituted due process of law, whereas the lack of this publicity in the instant case is fatal to the validity of the district.

In support of this argument, appellant insists that the demurrer filed and sustained to the allegation of the complaint, that no notice of the intention to introduce

the special bill enacting this legislation was given and published as required by section 26 of article 5 of the Constitution, admitted the truth of that allegation. But this was not the effect of the demurrer. The demurrer did not admit the allegation that notice had not been given, but submitted to the court that, as a matter of law, the question was one into which the courts would not inquire, for the reason that the question of the fact of notice, as well as its form and sufficiency, was a legislative, and not a judicial, question. *Booe* v. *Road Imp. Dist.,* 141 Ark. 140. In other words, a demurrer admits only those facts which are well pleaded. *Pierce Oil Corporation* v. *Hope,* 248 U. S. 498; *Pierson* v. *Wallace,* 7 Ark. 282, 290; *Keith* v. *Pratt,* 5 Ark. 661.

It is true that, in passing upon the sufficiency of a notice to property owners to constitute due process of law, we test the act by a consideration of the shortest time under which notice could be given pursuant to this requirement, and that time is twenty-eight days, and, under the facts herein stated, we think this constituted due process of law. It may be said, in this connection, that the Legislature must have known that, as a practical proposition, a longer time would be required to fix the lien of the assessments upon the land than the shortest period under which it was possible to do so, and such was the case here.

The showing is made that appellant, who lived in Washington, D. C., knew nothing of the assessment of her lands until she applied for a statement of the taxes due thereon in January, 1920. But this lack of information was due to her failure to keep in touch with the progress of events in this State. It was a matter of the greatest notoriety that at the 1919 session of the General Assembly a road-building program was launched of such tremendous proportions as to attract very general attention. It was commented upon everywhere. The widest difference of opinion existed as to its wisdom, but every one at all familiar with the current history of

the State had knowledge of the existence of a road-building movement throughout the State. There had been a vast propaganda in the interest of good roads, which found its fruition in the enactment of special road laws in nearly if not all the counties of the State.

Act 245 became a law March 11, 1919. It was one of numerous other similar acts. The commissioners therein provided for proceeded immediately to carry out its purposes, and we recall no case among the numerous cases which have come before us for review in which the commissioners proceeded more expeditiously. By May 17 they had their plans and estimate of cost ready. Pursuant to the provisions of the act set out above, published notice was given on May 22 and May 29 that on June 14 a hearing would be had, at which any landowner might be heard in opposition to the approval of the proposed plans, and no one appeared to protest, either resident or nonresident. This proceeding was itself a part of the publicity necessarily involved in the proceeding to assess betterments. It will be remembered that the General Assembly created this district, as it had the right to do, and defined its boundaries. It may also be said that the General Assembly, if it had seen proper so to do, might have ascertained the betterments and assessed them against the lands, and this would have been due process of law. *Salmon* v. *Board of Directors,* etc., 100 Ark. 366; *Tims* v. *Mack,* 147 Ark. 112; *Dorsey Land & Lbr. Co.* v. *Board of Directors,* etc., 136 Ark. 524.

Here the Legislature created the district and defined its boundaries. Appellant's land were placed in the district by the action of the General Assembly itself, which was a legislative determination that those lands would be benefited by the proposed improvement of the highways within the district; and, after doing this, the act provided that the commissioners should determine the assessment of benefits and damages against the respective tracts of land in the district, and should determine, as an administrative matter, the per cent. of

these betterments to be levied and collected each year; and we think the notice which the act required is sufficient to constitute due process of law.

In answer to this insistence, it will again be recalled that the district is of legislative creation, and section 1 thereof created Road Improvement District No. 2 of Conway County, and gave it that name and designated its boundaries, and the published notice referred to it by its official name, and gave the time and place when and where the assessments of betterments in that district would be heard. We think this was sufficient.

The third and fourth grounds of attack may be considered together. The court sustained a demurrer to that portion of the complaint which attacked the assessments on the grounds that they were made under a mistake of fact, and that there was a discrimination in favor of, or against, certain property owners. This action of the court must be affirmed, for there must come a time when such questions are foreclosed. It was upon the faith of these assessments that the district incurred obligations and issued negotiable bonds with which to pay them, and these bonds are owned by the investing public throughout the United States. The act expressly names the time when these questions are foreclosed, and that time is ten days after the completion of the hearing on the assessments by the commissioners, except as against property owners who, within that time, have applied to the chancery court for relief.

We have in many cases upheld this limitation upon the time within which property owners may complain. The recent case of *Pierce* v. *Drainage District No. 17,* 155 Ark. 89, collects a number of them. This question was very thoroughly considered by us in the recent case of *Road Improvement Dists. Nos. 1, 2 and 3* v. *Crary,* 151 Ark. 484, in which a very similar attack was made on an assessment of benefits. There the assessment had been made according to the zone system, which was said to be aribtrary and unreasonable, but we answered that and

other objections to the assessment as follows: ''We have often decided that the method provided in the statute for attacking the validity of the assessment of benefits is exclusive, and that it must be pursued within the time prescribed by the statute. In other words, it has been settled by repeated decisions of this court that a collateral attack cannot be made upon the assessment of benefits unless void on the face of the proceedings. *Reitzammer* v. *Desha Road Imp. Dist.,* 139 Ark. 168; *Summers* v. *Conway & Damascus Road Imp. Dist.,* 139 Ark. 277; *Nettles* v. *Hazlewood Road Imp. Dist.,* 144 Ark. 632; *Sikes* v. *Douglas,* 147 Ark. 469.''

In support of the proposition that there was no valid levy of the taxes here sought to be enjoined, it is urged that, as a jurisdictional requirement, the commissioners should have prepared and filed with the county clerk a record showing the entire levy against the entire district, with the entire cost of the improvement spread over a series of years during which it had been determined the taxes should be collected, and that without such a record there was no mandate to the county clerk to extend the taxes upon the taxbooks. It will be remembered that the county clerk is not an officer of the road improvement district, and that he would have no function to perform in the extension of the taxes on the taxbooks but for the fact that he is charged by law with the duty of making up the taxbooks used in collecting the general taxes, and, as the road improvement district taxes are collected at the same time, he must have the information upon which he can extend the improvement taxes against the respective tracts of land lying therein. The jurisdictional requirement is the action of the board in making the assessments and in authorizing their collection, to which end the county clerk performs the clerical duty of extending the taxes assessed against the land. Counsel insist that the act requires that the assessments be so made that any property owner might pay the assessment against his lands and thus stop the

running of interest thereon.  So it does; but we perceive no reason why appellant might not, in the beginning, have paid her assessment in full.  The total amount thereof was fixed and certain, and was shown in the record of these assessments kept by the commissioners and the copy thereof filed with the county clerk, as required by section 20 of the act.

We do not think it a jurisdictional requirement that there should have been filed, along with the assessment of betterments, a certificate by the commissioners showing the entire assessments for all the years during which the assessments would be collected.  We think this certificate could be made annually, otherwise no effect would be given to that portion of section 25 which reads as follows: "If the proportion of the assessment of benefits first levied is not sufficient to complete the improvement, the commissioners may make additional levies of such amounts as shall be sufficient to complete the improvement and pay all indebtedness of the district, the aggregate levy against any particular tract, however, not to exceed the assessment of benefits against that tract."

The commissioners might have made a levying order and furnished a certified copy thereof to the county clerk in the beginning, which order would have continued in effect until rescinded or altered, or until the betterments were consumed, pursuant to the directions of section 25; but this same section gave the commissioners the right to annually alter the proportion of the assessed benefits to be collected, and this necessarily implied the right to make an annual certificate of the proportion of the betterments to be collected.

The case of *Jefferson* v. *Conway County Bridge Dist.,* 147 Ark. 518, announces the principle which controls here, and that is that a failure to comply with a directory provision of an act will not invalidate an assessment if the jurisdictional requirements have in fact been complied with.

The record shows that the commissioners annually determined the percentage of the assessed benefits to be levied, but, after making the necessary levying order themselves, they passed resolutions requesting the quorum court to also levy the taxes, and the quorum court did so. This was an unnecessary thing to do, and added nothing to the validity of the levy; but we do not think this unnecessary action on the part of the commissioners and the quorum court operated to invalidate the levy.

The remaining ground of attack is that the commissioners made material and unauthorized changes in the plans of the road, which invalidated the assessment. The record reflects the following facts. The road in question is a link in the Little Rock and Fort Smith highway, one of the most frequently traveled highways in the State, and the original plans called for a road only nine feet wide. It was the opinion of both the State and Federal Highway departments that the road planned was not wide enough to carry the traffic over it, and those departments directed the laying of a sixteen-foot binder, instead of one of nine feet, and the change was made to conform to the requirements of the State and Federal highway departments, and for the purpose of securing aid from those departments which would otherwise have been withheld.

The original estimated cost of the improvement was $432,000, and the present estimated cost is $550,000, or $118,000 in excess of the original estimate. It is not shown what part of this cost is due to the change, rather than to increased cost of construction, but it is fair to assume that most, if not all, of the increase is due to this change. In consideration of this change an allotment of $64,000 of Federal aid was made, of which $30,000 has been paid, and an additional allotment of $75,000 has been recommended and which the commissioners feel assured will be granted. So that this aid, if received,

and when received, will more than equal the increased cost.

We think the change made, although extensive in the matter of cost, was not so material as to be beyond the authority of the commissioners to make. No change in the route or *termini* was involved, nor in the character of the road; the only change was that of increasing its width, and it appears this increased cost will be taken care of by an allowance of Federal aid which would not otherwise have been made. It is obvious that the proposed change adds to the value of the improvement, and certainly no property owner could expect any reduction of assessments on account of the change; and if it should operate to require the levy of a larger per cent. of the assessed betterments than would otherwise be the case, we are still of the opinion that the change is not so material as to be beyond the powers conferred by the act upon the commissioners in this respect. *Road Improvement Dist. No. 1* v. *Toler,* 130 Ark. 410; *Hout* v. *Harvey,* 135 Ark. 104; *Carson* v. *Road Improvement Dist.,* 150 Ark. 379.

Upon the whole case we think the complaint was properly dismissed as being without equity, and that decree is affirmed.

HART, J., (dissenting). Judge WOOD and myself agree that notice by publication is appropriate to the nature of the case; but are of the opinion that a publication for two weeks only is unreasonable, and therefore is violative of the "due process" clause of our Constitution. The imposition of assessments for local improvements by a board of assessors or other special tribunal is in the nature of a judicial proceeding, and when such assessment becomes final it is in the nature of a judgment against the lands upon which it is levied. Therefore the landowner is entitled to reasonable notice before any burden by way of special assessments is laid upon his land.

As the Hon. Joseph H. Choate once expressed it, the spirit of the constitutional rule is that the landowners shall have real bread in the matter of a hearing, and a publication of the notice for two weeks only puts them off with nothing but a stone. The notice by publication is for the purpose of apprising the landowners of the stated hearing upon their assessments to be given them by the board of assessors, and the notice should be published for a sufficient length of time to give the landowner an opportunity to acquire knowledge of the assessments and to prepare for his defense to it if he should deem it arbitrary, burdensome, or discriminatory. The constitutional validity of an act must be tested not by what has been done under it but by what may be done by its authority.

We agree that the publication of a notice for four consecutive weeks, as prescribed by the St. Francis levee act, construed in *Ballard* v. *Hunter,* 74 Ark. 174, is fair and reasonable to the landowner. We do not think that the ten days allowed the landowner who feels aggrieved by the action of the commissioners in assessing his land to file his complaint in the chancery court should be counted, for two reasons. To the same effect see *Roller* v. *Halley,* 176 U. S. 398.

In the first place, it is an established principle in all courts that the method of acquiring jurisdiction by publication is in derogation of the common law, and that the statutory requirements must be strictly construed in order to confer upon the court or other special tribunal jurisdiction in the premises. The object of the publication is to give the landowner notice of the hearing before the board of commissioners or assessors, as the case may be, and to give him an opportunity to prepare his case. Therefore the special tribunal ought to acquire jurisdiction in the premises before its action becomes final, and not afterwards.

In the next place, this court has held that the estimate of benefits is largely a matter of opinion, and that a

great amount of deference is due to the judgment of the board of assessors, which is constituted as a special tribunal for the purpose of determining that question. Hence it was held that courts reviewing the proceedings of the assessors should not substitute the judgment of the judges for that of the assessors unless the evidence clearly shows that the assessments are erroneous. *Rogers v. Highway Imp. Dist.*, 139 Ark. 322, and *Wilkinson v. Road Imp. Dist.*, 141 Ark. 164.

So it will be readily seen that the landowner does not have the same, chance to have his assessments corrected by review in the courts as he would have had in the first instance before the board of assessors, and a reasonable time should be given the landowners before the original hearing. The publication of the notice for a reasonable time is what gives the landowner constructive notice of the proceedings.

The statute provides that the commissioners shall designate a date not less than ten days after the last insertion of the notice as the date for hearing complaints of the assessments. This is a legislative declaration that the service is complete at that time. Hence it will be seen that the court should not add ten days by judicial construction to the time allotted by the Legislature upon the specious plea that the landowner gets a *de novo* hearing in the chancery court, when, according to the settled practice of this court, he gets nothing more than a review of the proceedings of the assessing board.

As a sort of make-weight argument, the majority opinion says that the current history of the State shows that there had been a vast propaganda in the interest of good roads which resulted in the special road acts passed by the Legislature of 1919.

We have not read the history of the times through the same glasses. According to our view, there had been no public discussion looking towards the adoption of a system of constructing good roads throughout the State. Reckless and extravagant statements as to the cost of

the roads and of the amount of Federal aid which would be received, which were calculated to lull the landowners into nonaction, were spread abroad after the passage of the special road acts.

The records of the Legislature show that no notice of the intention to pass any of these special acts was given and exhibited in the General Assembly, as required by art. 5, sec. 26, of our Constitution. During a legislative session of sixty days one volume of general acts of five hundred and twenty-two pages was passed; and there was also one volume of special acts of ten hundred and sixty pages. In addition to these the special road acts were published in two volumes, with a total of twenty-seven hundred and sixty pages of the size of those used in an ordinary law book. The roads provided for are not part of a system and have no relation to each other. It would have been a physical impossibility for these special acts to have been read three times, as required by our Constitution, within sixty days.

Special acts, under what is called legislative courtesy, are passed upon the request of the members introducing them. Referring to the history of the times recited in the majority opinion, we find that these special road acts were enacted for all the counties in the State. Not only was there no provision for giving the landowners a voice in the necessity or expediency of passing the acts imposing the whole cost of constructing the improved roads upon the landowners, but, in order to prevent a referendum to the qualified electors, the last section provides that, the act being necessary for the immediate preservation of the public peace, health and safety, an emergency is declared, and it shall take effect at once.

The court records will show that many of these special acts were prepared by attorneys representing special interests; and, if current history is the criterion, practically all of them were prepared by such attorneys, and protesting landowners were given no voice in the

matter, although each act called for a bond issue of twenty-five or thirty years' duration.

Local assessments are not founded upon any idea of revenue, but upon the theory of special benefits conferred upon the adjacent lands. If an illegal method of assessment is adopted, it is the same in principle as if no assessment at all was made, and the special tax imposed amounts to an illegal exaction, which a landowner may resist whenever it is attempted to be asserted. Thus it will be seen that the system is open to grave abuses, and may lead to oppression and confiscation. Hence the importance to the landowner of being given a reasonable time to act in the first hearing, to the end that he may not be deprived of his property without due process of law.

The fair name and fame of our State can best be kept inviolate by giving the landowners a reasonable opportunity to be heard before fixing a burdensome or arbitrary special assessment on their lands, and such reasonable notice should be one that would carry into practical effect the declaration of our bills of rights, that all men have the inherent and inalienable right of acquiring, possessing, and protecting property; and its guarantee that the right of property is before and higher than any constitutional sanction.

We recognize that, after the board of assessors or other special tribunal has once acquired jurisdiction over the lands, short statutes of limitations might be provided within which to review these assessments. The landowner is then already in court, so to speak, and should prosecute with diligence his right to review the finding of the board of assessors, to the end that the construction of the improvement may not be unduly delayed.

Protesting, as we have often done before, against the zone system of assessing road districts, we believe that the present case goes further than any other previous decision in upholding such a system. It is true that the Legislature may commit to a special tribunal the

power of apportioning the cost of an improvement and assessing the expense thereof, unless the method prescribed is plainly unadapted to arriving at a fair and equitable result. The Legislature has no power itself to make arbitrary assessments, or to grant power to subordinate tribunals that may be so exercised.

In *Bush* v. *Delta Road Imp. Dist.,* 141 Ark. 247, we expressly stated that the power to make special assessments for local improvements and the power of apportioning them are identical and inseparable. Hence it was held in the last-cited case that in making the assessment it is proper to consider the nature and location of the lands in the district, the condition and character of the improvement, the cost and relative value of the property to the assessment, and as well the fact whether the plan and method adopted has resulted in imposing a burden in substantial excess of the benefits or disproportionate as between the landowners in the district.

In other cases we have recognized that local assessments may so transcend the limits of equality and reason that its exaction would cease to be a tax and become extortion and confiscation. *Coffman* v. *St. Francis Drainage District,* 83 Ark. 54, and *McClelland* v. *Pittman,* 139 Ark. 341. Relief was denied in the cast last cited because the complaint did not allege the specific facts which would constitute the arbitrary abuse of power. In other words, the Legislature cannot act or authorize a subordinate tribunal to act upon an illegal principle of assessments or arbitrary method in making or apportioning it.

*In re Washington Avenue,* 69 Penn. St., 352, the court expressly stated that taxation has a limit *per se,* and is not always coextensive with legislative exaction. Continuing, the court said:

"But, nevertheless, taxation is bounded in its exercise by its own nature, essential characteristics and purposes. It must therefore visit all alike in a reasonably practicable way of which the Legislature may judge,

but within the just limits of what is taxation. Like the rain, it may fall upon the people in districts and by turns, but still it must be public in its purpose, and reasonably just and equal in its distribution, and cannot sacrifice individual right by palpably unjust exaction. To do so is confiscation, not taxation; extortion, not assessment, and falls within the clearly implied restriction in the bill of rights.''

This court had this principle under consideration in *Radcliffe* v. *Scruggs*, 46 Ark. 96. In that case the court had under consideration a statute which provided, in substance, that all actions to test the validity of any proceeding in the appraisement, assessment, or levying taxes upon any land and all proceedings seeking to show any irregularties of any officer having any duty to perform in the assessment, appraisement, levying of taxes, or in the sale of land delinquent for taxes, or proceedings seeking to avoid any such sale for irregularities, shall be commenced within two years from the date of sale, and the court held the act to be unconstitutional. In discussing the statute the court said:

''But in this sweeping enactment the legislative department transcended the boundaries of its powers. It could not, under the Constitution of 1868, or any similar constitution, enact a statute which should transfer one man's property to another under a guise of a sale for nonpayment of taxes, when there had been no assessment or no levy of taxes. This would not be due process of law. Neither could it prescribe a short period of time, nor indeed any period, within which the owner must make his objections for such fundamental defects, he remaining in possession and being, in the instance supposed, in no default for not paying his taxes.''

Again, in *Stiewel* v. *Fencing District No. 6 of Johnson County*, 71 Ark. 17, the court had this principle under consideration as applied to improvement districts, and it was held that defects which are jurisdictional and indispensable could not be cured by limitation statutes; and

the case of *Radcliffe* v. *Scruggs, supra,* was cited to support the holding.

A short recitation of the undisputed facts in this case will show that the assessment of benefits by the zone system in this case resulted in an arbitrary discrimination against the appellant. She owned a farm comprising about 3,000 acres, but only 700 acres are in cultivation or susceptible of being put in cultivation by any practical method. The rest of her lands are covered by lakes and other bodies of water to such an extent that, according to the undisputed evidence, it is not practical to drain it and thereby render it fit for cultivation. Notwithstanding this, all her lands were assessed under the zone system, and the lands under water were assessed at the same rate as those in cultivation, where they were the same distance from the road. The board of assessors were bound to know the condition, the character, and configuration of the earth's surface within the proposed district. We recognize that courts cannot review the power of the Legislature, or its subordinate agency in the premises, unless the assessment has been made upon a demonstrable mistake of fact or that in making it the Legislature or its subordinate agency applied an illegal principle, or arbitrary method of assessment.

The zone system, as applied in the present case, under the undisputed evidence fails, as unreasonable and not a fair substitute for a valuation made by a designated tribunal acting according to law, and therefore violates the "due process of law" clause in our Constitution, which is a limitation upon arbitrary power and is a guaranty against arbitrary legislation. When the condition and character of the soil and the configuration of the earth's surface are taken into consideration, it is evident that the zone system of assessments in road improvement districts is necessarily arbitrary and discriminatory.

It is not like the case of a drainage or levee improvement district, where the land is covered with water and the construction of the drainage ditch or the levee re-

claims it.  In such case it is impossible to foresee exactly how a proposed tax will fall, and if the construction of the improvement increases the value of the different classes of land within the district proportionately, the burden will be distributed in as fair and just way as can be done.  But in road improvement districts the case is different.  The road which it is proposed to improve is already laid out and in use; it serves the landowners adjacent to it, as well as the general public.  As above stated, its situation with reference to the land is known in advance of the assessment.  To charge the cost of the improvement upon farm lands lying within a designated distance on each side of the road at a fixed sum per acre necessarily results in discrimination, and is so obviously onerous and unreasonable that it cannot, on any fair principle of reasoning and justice, be said to be a valuation according to benefits.

The kind and character of the soil and topography of the lands in the district do not change.  Natural objects, such as lakes, streams, hills, and hollows remain the same, so that it cannot be said that the proof might be one way in one case and another way in a subsequent case.  If an arbitrary or illegal method of assessment is adopted in the first instance, it is the same as if there had been no assessment of benefits, and the landowner has a right to resist at any time a suit to place a lien upon his property as an illegal exaction, if he remains in possession of his land by himself or through tenants.

Therefore we respectfully dissent, without expressing our opinion on the other questions raised by the learned counsel for appellant.